James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

UNIVERSITY CLUB TOWER, INCORPORATED, et al., Defendants.

Civ. No. 70–C–125.

United States District Court,
N. D. Oklahoma,
Civil Division.

Sept. 14, 1971.

L. H. Silberman, Solicitor of Labor, United States Department of Labor, Washington, D. C., M. J. Parmenter, James E. White, Dallas, Tex., for plaintiff.

Gable, Gotwals, Harp, Rankin & Fox, Tulsa, Okl., for defendants.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

The Plaintiff, James D. Hodgson, Secretary of Labor, in his official capacity, brings this action to permanently enjoin Defendants, University Club Tower, Incorporated, Mansion House, Incorporated, and Kin-Ark Company, Incorporated from violating certain provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. The specific violations deal with the failure on the part of the Defendants, Mansion

House, Incorporated and University Club Tower, Incorporated to pay certain employees the proper minimum and overtime wages and failure to keep records of the wages and hours of the persons employed as required by said Act as amended in 1961. The case is, by agreement of the parties, submitted upon a written stipulation of facts and their briefs and arguments.

Kin-Ark Company, Incorporated (Kin-Ark), owns Camelot Inn Motor Hotel (Camelot) and operates it as a division of Kin-Ark with management separate from that of University Club Tower, Incorporated (University Club) and Mansion House, Incorporated (Mansion House) both of which are also wholly-owned subsidiaries of Kin-Ark and such subsidiary corporations, respectively, own and operate University Club and Mansion House, both apartment houses. The offices of Kin-Ark are located in University Club. University Club and Mansion House are located adjacent to each other at 17th and South Carson Avenue in Tulsa, Oklahoma. They occupy adjacent parcels of land at this location. University Club and Mansion House are managed by a common management group which has its offices in University Club. University Club and Mansion House are engaged in the rental of apartment type living space, to individual and family tenants. The record is silent as to whether the apartments are furnished or unfurnished or the percentage of the two. The apartments furnished are designed and intended as permanent or semi-permanent living quarters. University Club and Mansion House provide such quarters with necessary utilities except telephone, and provide all necessary service functions, including parking space, mail delivery, garbage pickup, maintenance and repair and security. The cost of such utilities and service functions is included in the rental paid by the tenants. During the period from May 23, 1968, to the present, the combined annual dollar volume of these two apartment houses was less than $1 million. Camelot is located at the intersection of Interstate Highway 44 and Peoria Avenue in Tulsa, Oklahoma, some five to seven miles away from University Club and Mansion House. Camelot operates a multi-story motor hotel and is engaged in the rental of living space to transient individuals and families and meeting rooms to groups and organizations desiring the same. The rooms, suites, and meeting rooms rented to such tenants are furnished for short periods, usually less than one week. Camelot provides its tenants with furnished facilities and all necessary utilities. It provides the typical service functions rendered in a hotel operation, including baggage porters, room service, room telephones, television and radio reception, parking space, mail handling, garbage pickup, maintenance and repair, and security. The cost of such utilities and most of the services is included in the room rates paid by the tenants. During the period from May 23, 1968, to the present, Camelot has had an annual dollar volume in excess of $1 million. The combined annual dollar volume of Camelot and University Club and Mansion House has been, during the entire period since May 23, 1968, well in excess of $1 million. Each of these establishments has at least two employees who are regularly engaged in commerce or in the production of goods for commerce.

The primary assertion of the Secretary is that the three Defendants constitute an "enterprise engaged in commerce or in the production of goods in commerce" within the meaning of Section 203(r) and 203(s)(3) of the Act as amended in 1961 as to entitle certain employees of Mansion House and University Club to the monetary benefits of the Act.

The Defendants counter with basically two contentions. First, they assert that the operation of University Club and Mansion House and that of Camelot are not "related activities" under the Act since they do not have the same or bear one or more of the following characteristics: (i) Horizontal connection (as in a

chain store operation); (ii) Vertical connection (as in the case of a source of supply or user of goods or services); (iii) Auxiliary relationship (central office function for bookkeeping, warehousing, etc.); (iv) An integral relationship (such as in the Bank Building cases). Second, the Defendants assert that there is no "common business purpose."

The pertinent provisions of the Act as amended in 1961 are set out as follows:

" 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units. . . ." 29 U.S.C.A. § 203(r)

" 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person." 29 U.S.C.A. § 203(s)

"Any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000;" 29 U.S.C.A. § 203(s)(3).

■ Apparently activities are "related" under the above act when they are the *same* or *similar*. Jackson v. Airways Parking Company, 297 F.Supp. 1366 (ND Ga.1969). Plaintiff urges that the operation of a hotel and an apartment house are similar in that both operations furnish living space to individuals. Commenting on the new 1966 amendments the Senate Report reiterated its meaning of "related activities":

"Also, the operation through substantial ownership or control of a number of firms engaged in similar types of business activities constitute, in the Committee's view, related activities performed through unified operation or common control within the meaning of the definition of enterprise. The fact that the firms are independently incorporated or physically separate or under the immediate direction of local management as in Wirtz v. Hardin, 16 Wage Hour Cases 722 (N.D.Ala.), is not determinative of this question." (S.Rep. No. 1487, U.S.C. Congressional and Administrative News, 1966, page 3009)

Although hotel living accommodations in the form of single and double furnished bedrooms and suites and meeting rooms for short-term tenants are different from apartments containing bedrooms, living rooms and kitchens for long-term tenants, the buildings and operations in renting living space to individuals are somewhat similar in the broad sense and require similar though not identical kinds of activities to operate and maintain. Camelot maintains and services the same general type of buildings, provides the same kind of utilities, and provides service functions in a similar fashion as does the common management group of University Club and Mansion House for the two apartment houses. The activities necessary to the rental of hotel rooms and apartments, while again not identical, are similar. Both Camelot and University Club and Mansion House must advertise for tenants, maintain their buildings and grounds in attractive condition and maintain accurate books and records of their tenants and suppliers. It is perhaps also to be noted that Camelot has approximately 400 rooms and the two apartment houses together have approximately 420 apartments.

Three circuit courts have construed the 1961 enterprise coverage amendments, and the meanings to be given "related activities", "common control", and "common business purpose", the Tenth Circuit in Wirtz v. First National Bank and Trust Company, 365 F.2d 641 (Tenth Cir. 1966), the Fifth Circuit in

Wirtz v. Savannah Bank and Trust Company of Savannah, 362 F.2d 857 (Fifth Cir. 1966) and the Sixth Circuit in Wirtz v. Columbian Mutual Life Insurance Company, 380 F.2d 903 (Sixth Cir. 1967). In each of these cases, the courts held that the operation of the banks, or the insurance company, and the operation of their office buildings in which they were located were "related activities".

■ The activities of operating Camelot as a hotel and University Club and Mansion House as apartment houses would appear to be much more similar than the operation of a bank and an office building in which it is located or the operation of an insurance company and an office building in which it is located. Therefore, the Court is inclined to conclude, though reluctantly, that the operation of Camelot on the one hand and the operation of University Club and Mansion House on the other hand are "related activities" within the meaning of the Act and the first of the three requirements is met.[1] This conclusion is reached on the basis of similarity which is being used in the broad sense. It is apparent, however, that there are several significant differences in the operation of a hotel and an apartment house as noted above. Also, it is possible to read Wirtz v. Savannah Bank & Trust Company of Savannah, *supra*, to hold that related activities cannot exist if the two operations are physically separated into two buildings located at some distance from each other. See 362 F.2d pages 860–861.

■ The evidence discloses that there is no "unified operation" of Camelot and University Club and Mansion House. Camelot is operated entirely separate from University Club and Mansion

House. It is also physically separated by several miles. There does not appear to be any common bookkeeping, central purchasing, mutual services or any showing that Camelot in any way supports University Club and Mansion House or vice versa. However, it is clear that there is "common control" of Camelot and University Club and Mansion House for they are all owned by Kin-Ark and may be controlled by Kin-Ark as it sees fit. Thus, the second of the three requirements is met.

■ The Tenth and Fifth Circuits, which reversed the lower courts[2] by their decisions in the bank cases, Wirtz v. First National Bank and Trust Company, *supra* and Wirtz v. Savannah Bank and Trust Company of Savannah, *supra*, found a "common business purpose" between the bank and its office building subsidiary from the following factors:

1. National banks are precluded by law from engaging in activities not related to banking.

2. A recognized incident to banking operations is the right to own an office building and the operation of the building is an auxiliary and service function to the bank.

3. The building is an investment, asset and base of operations for the bank.

4. Maintenance and service work is essential to the conduct of the bank's image.

5. Management operates the complex as an integral unit.

6. Operation of the office building enabled the bank to locate in a desirable downtown area.

7. Operation of the office building provides space for future expansion.

8. Ownership of building improved bank's image in the public eye.

1. Wirtz v. Savannah Bank & Trust Company of Savannah, *supra*, provides:
"The statutory definition of 'enterprise' requires the existence of three elements: (1) related activities, (2) unified operation or common control, and (3) a common business purpose."

2. Wirtz v. First National Bank and Trust Company, 239 F.Supp. 613 (Okl.1965) and Wirtz v. Savannah Bank and Trust Company of Savannah, 247 F.Supp. 547 (Ga.1964).

9. Economies resulted in operations from standpoint of revenues and taxes.

In the insurance company case, Wirtz v. Columbian Mutual Life Insurance Company, *supra*, these factors were held to evidence a common business purpose:

1. Ownership of office building furthered its insurance business.

2. Ownership of building facilitated internal operations of insurance company.

3. Ownership of building aided in establishing a favorable public image.

In all the cases, the fact that the various entities have as a "common business" purpose the profit motive was considered merely incidental and insufficient, standing alone, to support a "common business purpose". Wirtz v. First National Bank and Trust Company, *supra*.

Kin-Ark with its division Camelot takes the place of the banks or insurance company in the cases cited. Mansion House and University Club are not physically a part of the building in which Camelot is housed. There is no integral relationship nor is there a vertical connection, horizontal connection or auxiliary relationship as these terms have been discussed above. There is no space provided for future expansion. Camelot and the apartment houses are not operated as a unit or a complex as were the three interconnected buildings in Wirtz v. First National Bank and Trust Company, *supra*. There is no downtown (none are downtown) or other location relationship between Camelot and the two apartment houses. They are several miles apart. The tenants of Mansion House and University Club would ordinarily have no reason to use any of the hotel facilities of Camelot and the guests of Camelot would ordinarily have no reason to use the apartment house facilities. There is nothing in the stipulated facts to indicate that the apartment houses are operated in order to improve the public image of Camelot, or that they furthered its business or that they facilitated its internal operation or that they are essential to the conduct of its business. While it is possible that certain economies could be effected by having unified operation of the three units, i. e., central purchasing for example, there is no evidence of this. The evidence shows completely separate operations by Camelot and the two apartments. Their operations not only can be divorceu but they are divorced. Ownership of apartment buildings is not a recognized incident of hotel operations. No economies, tax or otherwise, have been shown to result from the operations. One factor mentioned in the bank cases which is present is that the apartment buildings are an investment, as is Camelot, all investments of Kin-Ark. And, University Club happens to be Kin-Ark's base of operation even though it could easily locate elsewhere.

The Court therefore finds and concludes under the evidence herein that Plaintiff has failed to show the presence of a "common business purpose" as contemplated by § 203(r) of the Act. It is, thus, determined that the 1961 amendments to the Fair Labor Standards Act of 1938 did not extend the coverage of the Act to the employees of Mansion House and University Club for there is no "common business purpose" between them and Camelot within the intent and meaning of the Act. Therefore, the prayer of the Secretary for injunctive relief must be denied, and judgment should be entered dismissing the action of the Secretary.